DALY and others, Appellants, v. NATURAL RESOURCES BOARD, Respondent. [Case No. 218.] *

McCONNELL, Public Intervenor, Appellant, v. NATURAL RESOURCES BOARD, Respondent. [Case No. 219.] *

*Argued June 4, 1973.—Decided June 29, 1973.*
(Also reported in 208 N. W. 2d 839.)

* Motions for rehearing denied, without costs, on August 28, 1973.

For the appellants there was a brief by *Joseph F. Preloznik* and *Mary V. G. Thoenig,* Wisconsin Judicare, of Madison, and oral argument by *Mr. Preloznik.*

For the respondents there was a brief by *W. Scott Van Alstyne, Jr.,* of Madison, special counsel for the department of natural resources and natural resources board, and *Charles J. Herro* of Oconomowoc, of counsel, for N. E. Isaacson & Associates, Inc., and Menominee Enterprises, Inc., d/b/a Lakes of the Menominees, and oral argument by *Mr. Van Alstyne.*

BEILFUSS, J. The appellants contend (1) that the proceeding before the DNR was a contested case and not a legislative hearing, (2) that due process "fair-play" requirements of ch. 227, Stats., for a contested case were not complied with, (3) that the notice requirements of sec. 31.06 (2) were not complied with, and (4) that findings of fact of the DNR were not supported by "substantial evidence in view of the record as a whole."

A brief résumé of some historical facts of Menominee county may be helpful in discussing the position of the parties and the issues before the court.[1]

In 1854, the United States government, by the "Treaty of Wolf River," gave the Menominees the land of the present Menominee county and afforded them a protective Indian reservation status with federal supervision. In 1954, Congress passed the "Termination Act," which became effective April 30, 1961. The act provided for the end of supervision and control over the Menominees and their reservation, subject to a termination plan to be approved by the secretary of interior. Such a plan was approved. The reservation became Menominee county. There were 3,270 enrolled members of the tribe who have a beneficial interest in the property, both real and personal, of Menominee county. The plan also called for the creation of a corporation known as Menominee Enterprises, Inc. (MEI). MEI was to manage and operate all the real and personal property transferred to it by the United States government. About a quarter of a million acres (now Menominee county) were transferred by deed from the United States to the corporation. MEI then transferred all its stock in one certificate to a voting trust. MEI is one of the co-partners of LOM, the applicants for the permit. MEI determined that it and Menominee county could not function on an adequate

---

[1] A much more detailed description of the historical events and some of the parties appears in *Tomow v. N. E. Isaacson & Associates, ante*, p. 1, 208 N. W. 2d 824.

economic basis without additional revenue. It decided that it was necessary to devote a part of the land to expanded public recreational purposes to generate the needed income. Pursuant to a survey and a recommended plan, some 8,000 acres were set aside for an economic development zone. Of this 8,000 acres, about 5,000 acres at $150 per acre were conveyed to LOM for recreational development purposes to be subdivided and some of the land sold to Indians and non-Indians alike. The voting trust authorized the sale and executed the deeds to LOM, who in turn have sold a considerable part in small parcels to a multitude of purchasers.[2] In *Tomow, supra,* this court upheld the power of the voting trust to convey the land and the validity of the deeds to LOM after a legal challenge by some of the enrolled Menominees.

A part of the development plan called for the creation of three larger lakes to encompass several smaller ones to provide for a more usable and salable shoreline (among other purposes). Two of the lakes, Legend Lake No. 1 and Legend Lake No. 2 are in existence under valid permits and their legality is not challenged here. To complete the project the DNR has granted a permit, now at issue here, to construct the dam to create Legend Lake No. 3 upon the application of LOM.

The controlling statutes (1969) for a permit to build the dam contemplated in the application are as follows:

"31.05 **Applications for permits to construct.** Any person, firm, corporation or municipality desiring a permit to construct, operate and maintain a dam shall file with the department a written application therefor, setting forth:
"...
"(2) The purpose or purposes for which the proposed dam is to be constructed, operated and maintained.

---

[2] All of these facts do not appear in the record in this case but we take judicial notice of them from the record and opinion in *Tomow, supra,* for the purpose of clarification.

"(3) In case the application is for a permit to construct, operate and maintain a dam for a private purpose, proof satisfactory to the department that the applicant owns or has an enforceable option to purchase the described dam site and at least 65% of the land to be flowed, or the flowage rights on at least 65% of such land. This subsection shall not apply to a person who has the power of eminent domain."

"31.06 **Hearing.** (1) Upon receipt of an application for a permit the department shall fix a time, not more than 8 weeks thereafter, and a convenient place, for a public hearing thereon. It shall give notice of such time and place to the applicant who shall cause the same to be published in each county in which riparian lands will be affected by the proposed dam as a class 3 notice, under ch. 985. The department shall also give notice of such time and place to the county clerk of the county in which the proposed dam and flowage created thereby are located.

"(2) In addition to such publication the applicant, not less than 20 days prior to such hearing, shall mail to every person interested in any lands that will be affected by the proposed dam and whose post-office address can by due diligence be ascertained, notice of the time and place set for such hearing. This notice shall be accompanied by a general statement of the nature of the application and shall be forwarded to such persons by registered mail in a sealed and postpaid envelope properly addressed. Proof of such publication and notice shall be filed with the department.

"(3) At such hearing or any adjournment thereof the department shall consider the application, and shall take evidence offered by the applicant and other persons in support thereof or in opposition thereto, may require the amendment of the application, and if it appears that the construction, operation or maintenance of the proposed dam is in the public interest, considering esthetic, economic and recreational values, the department shall so find and grant a permit to the applicant, provided the department also finds that the applicant has complied with s. 31.14 (2) or (3) and, where applicable, with s. 31.05 (3), based on the department's own estimate of the area of the flowage. The enjoyment of natural scenic beauty is declared to be a public right to be considered

along with other public rights and the economic need of electric power for the full development of agricultural and industrial activity and other useful purposes in the area to be served. . . ."

"31.14 **Proof of ability to maintain dams required.** . . .

"(2) Except as provided in sub. (3), a permit shall not be granted under s. 31.06, 31.08 or 31.13:

"(a) Unless the applicant furnishes to the department proof of ability to operate and maintain the dam in good condition, either by the creation of a special assessment district under ss. 31.38 and 66.60, or by any other means which in the department's judgment will give reasonable assurance that the dam will be maintained for a reasonable period of time not less than 10 years; . . ."

The application was properly filed with the DNR; the DNR fixed the time of hearing, notified the applicant, the county clerk, and the town clerk. The applicant had a notice published in an appropriate newspaper. The hearing was convened in Madison and adjourned to Green Bay. Several persons and groups appeared individually and some by counsel.

The examiner announced at the outset of the proceedings that it was a legislative hearing to determine whether a permit should be granted. He stated "that the rules of evidence so far as relevancy, materiality, competence, matters of credibility of witnesses and so on" were not so important but that a judicial-type format and procedure would be followed. Twenty-eight exhibits were received and twenty-eight persons testified, were cross-examined or made statements. Those opposing the application for the permit challenged the ownership of the land affected (this issue has been resolved by *Tomow, supra*), its effect on other waters and riparian lands, its economic feasibility, its effect upon tribal hunting and fishing rights,[3] and its effect upon esthetic and ecological values.

[3] *See Menominee Tribe v. United States* (1968), 391 U. S. 404, 88 Sup. Ct. 1705, 20 L. Ed. 2d 697.

The appellants contend that this proceeding was a contested case and that the due process, fair-play rules apply, which in turn require notice of hearing and description of the issue, the right to present witnesses and cross-examine. Further, that findings of fact and conclusions of law must be made. And equally important, the standard of review is "substantial evidence in view of the record as a whole."

In contrast, in a legislative-administrative hearing the same rigid notice requirements do not apply, due process procedure is not required and the administrative body can determine whether or not the applicant for a permit has complied with statutory standards from additional evidence or information gathered on its own initiative and outside the record. Further, the standard of review of a legislative hearing is whether the action of the administrative agency or board was "arbitrary and capricious."

The trial court concluded this was a legislative proceeding and not a contested case. The trial court, however, further concluded that even if this was a contested case that due process had been afforded and that the findings of fact were supported by substantial evidence in view of the record as a whole, with exceptions not pertinent here.

A contested case as it applies to an administrative board is defined in sec. 227.01 (2), Stats., as follows:

" 'Contested case' means a proceeding before an agency in which, after hearing required by law, the legal rights, duties or privileges of any party to such proceeding are determined or directly affected by a decision or order in such proceeding and in which the assertion by one party of any such right, duty or privilege is denied or controverted by another party to such proceeding."

From the statute it is clear that three elements must appear before the proceeding becomes a contested case. First, there must be a hearing required by law—sec.

31.06, Stats., requires a hearing. Second, the legal rights, duties or privileges of one party must have been determined or adversely affected by the proceeding—here the right or privilege of LOM to construct the dam was determined. Third, the assertion of those rights, duties or privileges must have been denied or controverted by another party to the proceeding. The right and privilege of the applicant, and even the performance of the duties evolving upon a successful applicant, were denied and controverted. The question remains as to whether those contesting the application were parties to the proceedings within the meaning of the statute.

We believe our opinion in *Muench v. Public Service Comm.*[4] (1952), 261 Wis. 492, 53 N. W. 2d 514, 55 N. W. 2d 40, written by Mr. Justice CURRIE, is analogous and compels a determination that this is a contested case. There, Mr. Muench, a private citizen and a member of the Izaak Walton League, appeared before the commission to oppose the construction of a dam across the Namekagon river in Washburn county. The court held that although Muench had no direct financial interest which would be jeopardized by the issuance of a permit to build the dam, he did have a legal right as a citizen to protect his public right to enjoy his navigable streams for recreational purposes—including the enjoyment of scenic beauty—and that he was an aggrieved party and affected by an order granting the permit.

We conclude the appellants, as citizens of Wisconsin, had the same right to the status of a party as did Mr. Muench in the *Muench Case*. As enrolled members of the Menominee Tribe they had an additional indirect right in the preservation of their hunting and fishing privileges. When the appellants appeared and contested the rights or privileges of LOM to construct the dam they

---

[4] *See also: Margoles v. State Board of Medical Examiners* (1970), 47 Wis. 2d 499, 177 N. W. 2d 353.

became parties within the meaning of the statute and the proceeding became a contested case.

The appellants contend they were not afforded due process or fair play in the hearing as required in a contested case by ch. 227. We disagree. While due process must be extended in an administrative contested case, this does not mean that all of the procedural niceties of a judicial trial must be observed. The appellants had notice of hearing, they did appear in person and by counsel, they knew the nature of LOM's application, and the statute set forth the standards to be applied. They were permitted reasonable cross-examination and the right to be heard personally and by counsel as to the particulars of their opposition. The DNR did make and file extensive written findings of fact and conclusions of law, together with a specific order. This procedure complies with fair play and due process.

The appellants have raised several specific complaints as to a want of due process. We have examined the record carefully and find none of them to be of such moment individually or collectively so as to amount to want of due process. For this reason we will comment on them only briefly.

There is a contention that the notice provisions of sec. 31.06, Stats., have not been complied with in that personal service of notice or notice by mail was not given to them or any of the 3,270 enrolled Menominees. In *Tomow, supra,* it was determined that title to land and the right to manage it and sell it was in MEI and the voting trust. The individually enrolled Menominees therefore did not have sufficient personal interest so as to entitle them to personal notice. Notice was published in the newspaper most likely to be seen by the residents of Menominee county. Without question, they did have actual notice—they did appear and did participate.

They complain that their counsel and others not appearing in this appeal were denied full right of cross-

examination. Our review of the record convinces us all parties were given reasonable rights of cross-examination.

A claim is made that the examiner was too patronizing to some of those appearing without counsel and opposing the application. A review of the record suggests to us the attempt of the examiner to assist these people was not a fault but a virtue.

A more serious complaint is that the examiner, Van Susteren, for apparent compelling personal reasons, found it necessary to absent himself before the hearing was completed. Instead of adjourning the matter he directed that Mr. Main, an attorney for the DNR who was appearing and participating in the proceeding for the game and fisheries division in opposition to the application, take over as examiner. This practice is difficult to approve—certainly it should not be resorted to except in exceptional circumstances. Here there is no prejudice to the appellants—his interest was consistent with theirs—he appeared to oppose the application.

The appellants further challenge the sufficiency of the evidence to support the findings of fact. Because we have concluded this is a contested case, the standard of review is whether the findings are supported by substantial evidence in view of the record as a whole.

The substantial evidence test is whether reasonable minds could arrive at the same conclusion by the DNR. *Ashwaubenon v. State Highway Comm.* (1962), 17 Wis. 2d 120, 115 N. W. 2d 498. The guidelines in applying this test were just recently reiterated in *Reinke v. Personnel Board* (1971), 53 Wis. 2d 123, 135, 138, 139, 191 N. W. 2d 833:

" ' . . . The basic case is *Gateway City Transfer Co. v. Public Service Comm.* (1948), 253 Wis. 397, 34 N. W. 2d 238. That case pointed out that in reviewing administrative decisions, "substantial evidence" did not include the idea of this court weighing the evidence to determine if a burden of proof was met or whether a view was

supported by the preponderance of the evidence. Such tests are not applicable to administrative findings and decisions. We equated substantial evidence with that quantity and quality of evidence which a reasonable man could accept as adequate to support a conclusion. And, in this process, sec. 227.20 (1) (d), Stats., providing that the decision of an agency may be reversed if unsupported by substantial evidence in view of the entire record as submitted does not permit this court to pass on credibility or to reverse an administrative decision because it is against the great weight and clear preponderance of the evidence, if there is substantial evidence to sustain it.

" 'Substantial evidence is not equated with preponderance of the evidence. There may be cases where two conflicting views may each be sustained by substantial evidence. In such a case, it is for the agency to determine which view of the evidence it wishes to accept. Likewise, there are cases where only one view can be supported by substantial evidence and the determination depends upon the credibility of witnesses.'

" . . .

" ' "[T]he term 'substantial evidence' should be construed to confer finality upon an administrative decision on the facts when, upon an examination of the entire record, the evidence, including the inferences therefrom, is found to be such that a reasonable man, acting reasonably, *might* have reached the decision; but, on the other hand, if a reasonable man, acting reasonably, *could not* have reached the decision from the evidence and its inferences then the decision is not supported by substantial evidence and it should be set aside." '

" . . .

" 'We deem that the test of reasonableness is implicit in the statutory words "substantial evidence." However, in applying this test the crucial question is whether a reviewing court is only to consider the evidence which tends to support the agency's findings, or whether it is also to consider the evidence which controverts, explains, or impeaches the former. Use of the statutory words "in view of the entire record as submitted" strongly suggests that the test of reasonableness is to be applied to the evidence as a whole, not merely to that part which tends to support the agency's findings.' "

The applicants argue that the DNR's findings of fact 4, 5, 14, 16, 23, 27 and 28 are not supported by substantial evidence.

Finding of fact 4 states:

"The stated purpose of the proposed dam is to create a flowage which will be used for recreation by people who purchase lots in the adjacent subdivisions being developed by the applicants and thereby increasing the tax base in Menominee County and bringing additional monies into the area."

Appellants maintain that there is not even a scintilla of evidence in the record viewed as a whole that the benefits derived from a broader tax base will be greater than the cost of providing such services to the area. There is ample evidence to support the finding. As respondent correctly points out, Mr. Isaacson, Mr. Kenote and Mr. Harder all testified that the project to build a dam for subdivision purposes will increase the tax base in the county and that the benefits will outweigh the cost of the services. The evidence offered to the contrary as to the increased cost of schools, roads and community services was only general and speculative. The credibility of these witnesses and the weight accorded to their testimony are within the DNR's province and not the courts. *Copland v. Department of Taxation* (1962), 16 Wis. 2d 543, 114 N. W. 2d 858, and *Reinke v. Personnel Board, supra.*

Finding of fact 5 states:

"Menominee Enterprises, Inc., is the owner of the dam site and flowage area. They will deed the property to Lakes of the Menominees."

This issue has been resolved in *Tomow, supra.*

Finding of fact 14 states:

"The construction of Legend Lake #1 and #2 has caused a reversal of the groundwater table and thereby

caused the water levels of Round, LaMotte and Keshena Lakes to rise by seepage due to the head differential of approximately 8 feet."

The testimony on this finding was disputed. It dealt with the question of lake levels and what the water level will be with regard to the construction of the dam. Appellants here only argue the "weight" of the testimony. What weight should be given to conflicting testimony is again in the DNR's province. The DNR found the differential at eight feet, the appellants maintain it is 10 feet. Exhibit 6 gives the different lake levels in the area. Lake LaMotte is 836 feet, Round Lake is 839 feet, and Lake Keshena is 837 feet. The rise in the waters at Legend Lake is to be fixed at 845.7 feet. The height of Legend Lake over Keshena is 8.7 feet, over LaMotte is 9.7 feet, and over Round Lake is 6.7 feet. The average differential of these lakes is approximately eight feet.

Finding of fact 16 states:

"Long Lake located to the north of the third phase will not be disturbed nor connected to this development and will be left as a natural wildlife area."

The dispute here is also based on the credibility of the testimony and its weight to be accorded therein. Some witnesses testified that Long Lake will be disturbed while others said it will not. The department found that no such disturbance will occur. As stated in *Reinke,* in such cases it is for the agency to determine which view of the evidence it wishes to accept.

Finding of fact 23 states:

"The establishment of the trust fund for the operation and maintenance of the dam and flowage by the applicants and with the conditions of the order herein will comply with the provisions of section 31.14 (2), Statutes. This will provide proof to the Department and will give reasonable assurance that the dam will be maintained for a reasonable period of time, not less than ten years."

Appellants' argument that they can find no evidence to support this finding is without merit. Under sec. 31.14 (2), Stats., all that is required is that the applicant furnish satisfactory proof of its ability to operate and maintain the dam in good condition, which in the "department's judgment" will give reasonable assurance that the dam will be maintained for at least 10 years. The DNR has not abused its discretion in exercising that judgment. The town and county of Menominee will accept title to the dam and will help to preserve and maintain the property. Also, a trust fund in the amount of $100,000 was set up to help guarantee this assurance under sec. 31.14 (2). This clearly supports the DNR's judgment that there is reasonable assurance that the mandates of sec. 31.14 (2) will be complied with. The statute does not require proof by evidence beyond all reasonable doubt.

Findings of fact 27 and 28 state:

"27. The proposed dam will not adversely affect the quality of water and will not pollute Linzy Creek if the applicants meet the conditions of the order herein, and if the planned development is properly controlled by Menominee County.

"28. The cost, operation and maintenance of the proposed dam will be in the public interest, considering aesthetic, economic and recreational values."

Appellants admit in their brief that there is "testimony which if viewed alone would support this finding." But appellants state the finding is unreasonable in light of the entire record. What appellants are really saying is that because the testimony is in conflict on whether the quality of the water will be changed and whether Linzy Creek will be polluted, the DNR's findings are not supported by substantial evidence. This is a dispute over conflicting testimony and it is within the department's province to weigh it and accept that which it feels is

most credible. Some witnesses testified there will be no pollution nor will the quality of the water change. Others felt the contrary. A reasonable man could find support for either position because it was solely a question of whom do you believe. The DNR believed the truth was with the testimony of Mr. Isaacson, Professor Stephenson and Mr. Carlson that there will be no pollution.

We agree with the trial court that there is substantial evidence to support the findings of fact of the DNR challenged in this appeal. The order of the DNR, except as reversed by the trial court, should be approved.

*By the Court.*—Judgment affirmed.